2010 VT 102

## In re Melvin B. Neisner, Jr.

[16 A.3d 587]

No. 09-378

Present: **Dooley, Johnson, Skoglund and Burgess, JJ., and Bent, Supr. J., Specially Assigned**

Opinion Filed December 30, 2010

*Michael Kennedy*, Disciplinary Counsel, Burlington, for Petitioner-Appellee.

*Melvin B. Neisner, Jr.*, Pro Se, Killington, Respondent-Appellant.

¶ 1. **Johnson, J.** Respondent attorney Melvin B. Neisner, Jr. appeals from the recommended sanction of the Vermont Professional Responsibility Board Hearing Panel. Respondent was convicted of criminal offenses, including giving false information to a law enforcement authority and impeding a public officer, stemming from leaving the scene of a car accident and then falsely reporting that his wife had caused the accident. The Panel found that respondent had violated Vermont Rule of Professional Conduct 8.4(b), and it imposed both a suspension from the practice of law for a period of one year commencing on the date the order becomes final and, upon reinstatement to the bar, probation for a minimum term of one year during which time respondent must provide at least 500 hours of pro bono legal services. On appeal, respondent makes three arguments: (1) the sanction was inappropriate given the circumstances of his violations; (2) the sanction did not accord with prior professional responsibility cases; and (3) the delayed issuance of the Panel's decision violated his due process rights. Respondent does not, however, challenge the Panel's factual findings or its conclusion that he violated Rule 8.4(b). We uphold the Panel's conclusion that respondent violated Rule 8.4(b). We suspend respondent from the practice of law for a period of two years effective on the date his interim suspension began and impose probation of at least one year upon his reinstatement to the bar. During this probation, respondent must provide no fewer than 200 hours of pro bono legal services to persons unable to afford legal counsel.

¶ 2. Respondent and disciplinary counsel stipulated to certain facts. The Panel also made factual findings regarding the car accident and subsequent events that led to respondent's four criminal convictions and this disciplinary action.

¶ 3. While driving alone from his home to his office on the evening of September 22, 2007, respondent found himself behind two motorcycles. Because he believed they were traveling under the speed limit, respondent then passed the motorcycles. As he did so, he thought he saw one of the motorcyclists glare at him. After he began driving in front of the motorcycles, respondent thought that the motorcycle drivers had begun tailgating him. Respondent first accelerated and then quickly braked. Respondent felt an impact on his car but did not think it seemed very hard. He neither saw an accident nor thought that one had occurred, so he continued driving to his office. He did notice that one of the motorcycles followed him briefly.

¶ 4. After arriving at his office, respondent turned around to drive home and get something for his daughter. As he once again passed the location where he had accelerated and braked, respondent saw cars on the side of the road. He did not stop. When respondent arrived home, he left a telephone message for his attorney. He also drank several alcoholic drinks and convinced his wife to lie on his behalf. To explain this behavior, respondent testified that he had panicked when he had arrived home after the accident: he feared that he would lose his license to practice, his family, and his status in the community. He also worried about the consequences if it were discovered that he had consumed alcoholic beverages at two wedding receptions before driving and causing the accident.

¶ 5. Shortly after respondent drove to his home, a state trooper received a report of a vehicle that had left the scene of an accident in Killington. While at the accident scene — where he found an ambulance, a person on a backboard, and a damaged motorcycle, as well as skid marks — the trooper heard that a Killington constable had recognized a description of the car that left the accident scene as belonging to respondent. When the trooper went to the home of respondent, respondent told him that his wife had been in a car accident. Respondent went on to tell the trooper that he had been in the passenger seat as his wife drove and that they had felt something hit the car after she tapped the brakes to deal with two motorcycles tailgating them. He also explained that, acting on his advice, his wife did not stop and, instead, drove home. When the officer asked respondent how close the motorcycles had been to their car, respondent replied that he could not see them when he turned. To demonstrate, respondent turned his head over his left shoulder, suggesting that he had been in the passenger seat of the car. Based on respondent's statements, the trooper arrested respondent's wife for leaving the scene of an accident, took her to the Vermont State Police Barracks in Rutland, processed and cited her, and released her to her attorney.

¶ 6. The following morning, respondent sought counseling for alcoholism. He testified that he also began attending meetings of Alcoholics Anonymous that evening. During the month following the accident, however, respondent did not tell any law enforcement authorities that he had falsely accused his wife or that he himself had been driving alone at the time of the accident.

¶ 7. The State scheduled an inquest for November 2, 2007, in the case against respondent's wife. On October 29, 2007, the state trooper who had interviewed respondent and arrested his wife served subpoenas directing respondent's wife, their two children, and another witness to appear at the inquest. The following day, respondent's attorney called the investigating trooper to schedule a meeting. At the meeting on October 31, 2007, respondent arrived with his attorney. The trooper advised respondent of his rights. Respondent told the trooper that he had falsely implicated his wife on the evening of the accident. He confessed that he, not his wife, had been driving at the time of accident and submitted a written statement to this effect.

¶ 8. Respondent was charged with multiple crimes. In November 2008, a jury found him guilty of four criminal offenses, including impeding a public officer in violation of 13 V.S.A. § 3001(a), and providing false reports to law enforcement authorities in violation of 13 V.S.A. § 1754(a).[1] The trial, like the accident, received significant coverage in the local newspapers. Following the convictions, the Office of Disciplinary Counsel filed a petition of professional misconduct against respondent. Respondent has been a licensed attorney in the State of Vermont since 1989 and has not previously been the subject of disciplinary action relating to his license to practice. Respondent and disciplinary counsel agreed that this Court could suspend on an interim basis respondent's license to practice law. We entered an order effective January 9, 2009, suspending respondent's license pending the final disposition of this disciplinary proceeding.

¶ 9. The parties stipulated to the Panel that respondent's conduct — based on his convictions for impeding a public officer and giving a false report to a law enforcement authority — violated Rule 8.4(b). Rule 8.4(b) states that it is professional misconduct for a lawyer to "engage in a 'serious crime,' defined as illegal conduct involving any felony or involving any lesser crime a necessary element of which involves interference with the administration of justice, false swearing, intentional misrepresentation, fraud, deceit." V.R.Pr.C. 8.4(b). Because impeding a public officer is a felony and giving a false report to a law enforcement

---

[1] Although the Panel's decision indicates that this is a violation of 13 V.S.A. § 7504(a), it is plain from the record that respondent was convicted of violating 13 V.S.A. § 1754(a) for knowingly giving false information to a police officer.

authority necessarily involves intentional misrepresentation and deceit, the Panel found that both convictions violated Rule 8.4(b).

¶ 10. Respondent presented to the Panel much oral and written evidence attesting to his ongoing contributions to his community. He has worked as a general practitioner in Killington for many years. Respondent has also volunteered in a variety of capacities, including serving as town moderator. In addition, he has been working with a licensed drug and alcohol counselor, who believes he is moving towards recovery.

¶ 11. The Panel chose to impose a prospective one-year suspension to address its concerns about the gravity of respondent's conduct and acknowledge the substantial mitigating factors present for respondent. In addition, the length of the suspension took into account the fact that respondent had already been suspended since January 9, 2009. To fully address the harm to the bar and to the public's perception of the legal system that respondent's conduct caused, the Panel also imposed a probationary period following reinstatement. The Panel set conditions for this probation, most notably that it last at least twelve months and that respondent perform at least 500 hours of pro bono legal work. The Panel also noted that a future Hearing Panel ruling on respondent's readmission to the bar might impose additional terms of probation.

¶ 12. On review, we accept a Hearing Panel's findings of fact unless they are clearly erroneous. A.O. 9, Rule 11(E); *In re Andres*, 2004 VT 71, ¶ 9, 177 Vt. 511, 857 A.2d 803 (mem.). We uphold a Hearing Panel's findings — whether of pure fact or mixed questions of law and fact — if they are "clearly and reasonably supported by the evidence." *Andres*, 2004 VT 71, ¶ 9 (quotation omitted). Although we accord deference to the Hearing Panel's recommendations on sanctions, this Court ultimately makes its own determination regarding appropriate disciplinary measures. *In re PRB File No. 2007-003*, 2009 VT 82A, ¶ 7, 186 Vt. 588, 987 A.2d 273 (mem.).

¶ 13. We uphold the Panel's finding that respondent violated Rule 8.4(b) as a result of his conviction for impeding a public officer, a felony.[2] See V.R.Pr.C. 8.4(b); 13 V.S.A. § 1; 13 V.S.A.

[2] In *State v. Neisner*, 2010 VT 112, 189 Vt. 160, 16 A.3d 597, we decide respondent's criminal appeal, affirming and vacating the convictions that underlie this disciplinary case. We affirm respondent's felony conviction for impeding a

§ 3001(a). There is no disagreement that respondent's felony conviction for the crime of impeding a public officer is professional misconduct as defined by Rule 8.4(b). The specific conduct that led to the ethical violation becomes important in our consideration of the appropriate sanction. Although impeding a public officer does not necessarily involve intentional misrepresentation, dishonesty, or deceit, in this case that was respondent's conduct. It was lying to the police officer that resulted in respondent's conviction for impeding a public officer, *Neisner*, 2010 VT 112, ¶ 14, and the parties agreed in their joint recommendation as to conclusions of law that intentional misrepresentation and deceit are necessary elements of providing false information to a law enforcement officer.

¶ 14. The dispute here is over the sanction appropriate to respondent's misconduct. Respondent argues that the sanction imposed by the Panel is too harsh. To guide our determination of the appropriate sanction in an attorney disciplinary matter, we look to the American Bar Association's Standards for Imposing Lawyer Sanctions (ABA Standards). *In re Warren*, 167 Vt. 259, 261, 704 A.2d 789, 791 (1997) (per curiam); see also Standards for Imposing Lawyer Sanctions (ABA Ctr. for Prof'l Responsibility 1986) (amended 1992) [hereinafter ABA Standards]. The ABA Standards offer guidelines for courts imposing sanctions following findings of lawyer misconduct. ABA Standards, at 1-2. They recommend sanctions and require us to weigh four factors when determining whether the recommended sanctions are appropriate: (1) the duty violated, (2) the attorney's mental state, (3) the actual or potential injury caused by the misconduct, and (4) the existence of aggravating or mitigating factors. *Warren*, 167 Vt. at 261, 704 A.2d at 791 (citing ABA Standards § 3.0, at 26).

¶ 15. We first consider the duty violated, the attorney's mental state, and the actual or potential injury caused by the misconduct. See ABA Standards § 3.0, at 26. Here, respondent violated an ethical duty to the public when he engaged in serious criminal conduct that reflected adversely on his honesty and trustworthiness. See *id.* § 5.0, at 38. Because "[t]he public expects

---

public officer. We vacate the conviction for providing false reports to law enforcement authorities, holding that to convict respondent of impeding a public officer, the jury had to find that respondent had provided false information to a law enforcement officer.

the lawyer to be honest and to abide by the law," respondent's criminal conduct violated his duty to "maintain the standards of personal integrity upon which the community relies." *Id.* The Comments to Vermont Rule of Professional Conduct 8.4 indicate that engaging in a serious crime indicates a lawyer's lack of characteristics relevant to law practice and reflects adversely on that lawyer's fitness to practice law. V.R.Pr.C. 8.4 cmt. 2. Respondent violated his most basic professional obligation to the public. ABA Standards § 5.11 cmt., at 38.

¶ 16. Respondent's mental state is not disputed. Respondent acted intentionally when he committed the crime underlying his ethical violation. See *id.* at 5, 19. As noted above, the parties jointly submitted that intentional misrepresentation was a necessary element of providing false information to a law enforcement officer; we have concluded in respondent's criminal case that providing false information to a law enforcement officer was a necessary component of his conviction for impeding a public officer. Respondent consciously sought to achieve a particular result when he falsely stated to the state trooper that his wife had caused the car accident. See *id.* at 19.

¶ 17. Respondent claims that his misconduct caused no injury. We disagree. The ABA Standards define "injury" to include "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct." *Id.* at 19. Contrary to respondent's argument, proof of negative perceptions of attorneys is not required for us to determine that his misconduct caused injury to the public. Similarly, public approval of respondent does not prove that no injury was done to the public. Respondent's misconduct in this case demonstrated a failure to "maintain personal honesty and integrity." *Id.* § 5.11 cmt., at 38. As the ABA Standards emphasize, "this type of misconduct is . . . closely related to practice and poses . . . an immediate threat to the public." *Id.* In fact, it is for just this reason that the ABA Standards recommend interim suspension from practice pending final determinations of discipline for lawyers who have committed such violations. *Id.* Respondent agreed that this Court could suspend his license to practice on an interim basis; this suggests an acknowledgment of the significant harm to the public resulting from his misconduct.

■ ■ ¶ 18. We turn next to the existence of aggravating and mitigating circumstances and their impact on our determination of the appropriate sanction. We consider aggravating and mitigating factors when determining what sanction to impose because these factors reflect the "unique facts and circumstances" of the disciplinary matter and enable us to achieve fairness in our sanction determinations. *Id.* § 9.1 cmt., at 50. While aggravating factors may justify an increase in the degree of discipline we impose, mitigating factors may justify a reduction. See *id.* §§ 9.2-9.3, at 50-51. In the case at hand, weighing these factors enables us to determine if disbarment, the presumptive sanction recommended by the ABA Standards for an ethical violation resulting from serious criminal conduct involving intentional misrepresentation, is appropriate in this particular instance. *Id.* § 5.11, at 38. We must decide whether the mitigating factors are significant enough to justify reducing the sanction imposed from one of disbarment to one of suspension. See *id.* § 9.3, at 50-51.

¶ 19. First, we examine the aggravating circumstances relating to respondent's violation. The ABA Standards list a number of aggravating factors that we may consider, of which at least three are present in this case. *Id.* § 9.2, at 50. Respondent had a dishonest or selfish motive for lying to the state trooper. See *id.* § 9.22(b), at 50. Respondent falsely implicated his wife because he feared the consequences of admitting the truth for himself and his family. He worried that he would lose his license to practice, as well as his standing in the community. Respondent had substantial experience in the practice of law at the time of his misconduct. See *id.* § 9.22(i), at 50. Respondent became a member of the Vermont Bar in 1989; when he committed the crime underlying this ethical violation, he had been practicing for nearly twenty years. Based on respondent's substantial experience as a lawyer, we hold him to a high standard: we would expect him to understand the gravity of his duty to maintain personal integrity. In addition, respondent's professional misconduct stemmed from illegal conduct. See *id.* § 9.22(k), at 50. Although a finding that an attorney has breached the duty to maintain personal honesty and integrity does not require that criminal charges have been brought against the attorney, here, a jury convicted respondent of impeding a public officer. See *id.* § 5.11 cmt., at 38. It was this felony conviction that led to his ethical violation.

¶ 20. We now examine a number of mitigating factors present in this case. Again, the ABA Standards list a variety of mitigating

factors that a court may consider when evaluating the degree of discipline to impose. See *id.* § 9.32, at 50-51. Respondent has no prior disciplinary record. See *id.* § 9.32(a), at 51. This is the first disciplinary action against him. Overall, respondent has exhibited a cooperative attitude towards these disciplinary proceedings. See *id.* § 9.32(e), at 51. As we discussed above, other penalties or sanctions are also being imposed on respondent for the criminal conduct that led to this disciplinary action. See *id.* § 9.32(k), at 51. Respondent has received a sentence for his conviction of impeding a police officer.

¶ 21. In addition, respondent has submitted a great deal of evidence, including witness testimony and letters, attesting to his good character and positive reputation in the community. See *id.* § 9.32(g), at 51. Respondent has a long history of community involvement and was the sole general practitioner in his town. Even after the incident that led to this proceeding, respondent was re-elected moderator of his community's town meeting. Respondent's apologies to his community and to other audiences demonstrate that respondent has experienced some level of remorse for his unlawful and injurious conduct. See *id.* § 9.32(1), at 51.

¶ 22. Respondent asks us to weigh heavily his alcoholism and subsequent rehabilitation. The ABA Standards state that a respondent's alcoholism may serve as a mitigating factor when alcoholism caused the misconduct, the respondent's recovery has been demonstrated by a successful rehabilitation, and a recurrence of the misconduct is unlikely because the recovery halted the misconduct. *Id.* § 9.32(i), at 51. In this case, it is not clear that respondent's alcoholism was the primary cause of his misconduct. Respondent acknowledged that he had felt panicked about the consequences of leaving the scene of the accident. This suggests that, whatever the impact of the alcohol on his decision-making, respondent's fear led him to give false information to the police officer in an attempt to protect himself. Respondent concedes that his false statements to the state trooper implicating his wife were "self-serving." In addition, respondent first acknowledged his alcoholism and sought treatment the day after the accident, but he let another month pass before confessing his misrepresentations to the authorities. While we consider respondent's alcoholism and recovery to be mitigating factors, we weigh them equally with the other mitigating factors.

¶ 23. We conclude that, on balance, the many mitigating factors outweigh the few aggravating factors present in this case. Because of the range of mitigating factors, we agree with respondent and disciplinary counsel that the presumptive sanction of disbarment is too severe. We determine that a sanction of suspension is appropriate for respondent. See *In re van Aelstyn*, PRB Decision No. 112, Vt. Prof'l Responsibility Bd., available at http://info.libraries.vermont.gov/PRB/112prb.htm (imposing suspension rather than disbarment otherwise appropriate for respondent attorney convicted of felony involving extortion where significant mitigating factors existed).

¶ 24. When determining the length of suspension appropriate here, we recall that the purpose of sanctions is to "protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar," as well as to deter other attorneys from engaging in misconduct. *In re Berk*, 157 Vt. 524, 532, 602 A.2d 946, 950 (1991). Although respondent does concede that a suspension is appropriate, he argues that we should impose a sixteen-month suspension effective on the date his interim suspension began. In oral argument, disciplinary counsel recommended a suspension of one year with an effective date of November 9, 2009, the date the Panel's recommended one-year suspension would have begun had respondent not appealed. Given that the presumptive sanction for respondent's actions is disbarment, however, a significant suspension is warranted in this case. In light of those factors, as well as the mitigating circumstances, we impose a suspension of two years. This suspension will run from January 9, 2009, the date respondent's interim suspension began. Respondent will thus receive credit for the time that his law license has already been suspended and will not be penalized for the time this case has been pending on appeal. Although credit for time in suspension is not required, it can be appropriate in a case of this kind. See *van Aelstyn*, PRB Decision No. 112 (emphasizing that while Panel ordered only one year suspension, total suspension period would be more than three years because of time respondent attorney was suspended under interim suspension); see also *Cuyahoga Cnty. Bar Ass'n v. Garfield*, 2006-Ohio-1935, ¶¶ 9-10, 846 N.E.2d 45 (giving respondent attorney who presented significant mitigating evidence suspension running from date interim suspension imposed); *Disciplinary Counsel v. Lash*, 623 N.E.2d 28, 29 (Ohio 1993) (giving respondent attorney with significant mitigating

circumstances credit for time license had already been suspended). This suspension length and effective date also recognize that following his suspension respondent will have to apply for reinstatement.

¶ 25. The Panel imposed terms of probation to become effective should respondent successfully apply for reinstatement at the conclusion of his suspension. It ordered that respondent provide no fewer than 500 hours of pro bono legal services to organizations or individuals engaged in community service. Respondent asked this Court to void these conditions of probation as excessively harsh. Disciplinary Counsel did not oppose this request, instead suggesting that the reinstatement process could offer an appropriate context in which to consider conditions of reinstatement. Although we reduce the number of hours of pro bono legal services that respondent must provide to 200, we conclude that this probation requirement should appropriately be considered part of the sanction, rather than solely a term of reinstatement from the suspension. See A.O. 9, Rule 8(A)(6)(a) (stating that probation may be imposed in conjunction with any other sanction or reinstatement from disbarment or suspension). We clarify that respondent must provide his pro bono legal service to individuals unable to afford legal counsel. This aspect of the probation reflects the duty to the public that respondent breached with his ethical violation.

¶ 26. A sanction comprised of a two-year suspension and probation, during which time respondent must perform at least 200 hours of pro bono legal services, is in keeping with those sanctions that we and the Professional Responsibility Board have imposed in other professional responsibility cases. Respondent nonetheless argues that the prospective one-year suspension imposed by the Panel was more onerous than sanctions imposed in similar professional responsibility cases. Many of the cases respondent cites, however, did not involve the "serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud" at the core of respondent's case. ABA Standards § 5.11(a), at 38; see, e.g., In re Mayer, 159 Vt. 621, 621-23, 617 A.2d 153, 153-55 (1992) (mem.) (imposing two-month suspension for respondent attorney who attempted to receive cocaine); In re Massucco, 159 Vt. 617, 617-18, 613 A.2d 718, 718-19 (1992) (mem.) (imposing four-month suspension for respondent attorney

who knowingly failed to file income tax returns); *In re Taft*, 159 Vt. 618, 618-19, 613 A.2d 717, 717-18 (1992) (mem.) (imposing four-month suspension for respondent attorney suffering from alcoholism who knowingly failed to file income tax returns); see also *In re Davis*, PRB Decision No. 117, Vt. Prof'l Responsibility Bd., available at http://info.libraries.vermont.gov/PRB/117prb.html (imposing three-month suspension and one-year probation for respondent attorney who possessed marijuana and marijuana cultivating equipment).

¶ 27. As disciplinary counsel argues, both Professional Responsibility Board Hearing Panels and this Court have imposed harsher sanctions on other attorneys with felony convictions than that imposed today on respondent. We emphasize that each professional responsibility case involves a unique combination of mitigating and aggravating factors for the adjudicating body to consider when determining whether the sanction recommended by the ABA Standards is appropriate. See, e.g., *Mayer*, 159 Vt. at 622, 617 A.2d at 155 ("There are present here several mitigating factors which were not present in the companion case of *In re Berk*. . . . [T]hese should be taken into consideration and accorded significant weight."). A Hearing Panel recommended a suspension of three years, rather than disbarment, for a respondent attorney found to have violated Rule 8.4(b) after being convicted of a felony for filing multiple false fee agreements in matters before the Social Security Administration because of the nature of the crime and the mitigating factors present. *In re Harrington*, PRB Decision No. 53, Vt. Prof'l Responsibility Bd., available at http://libraries.vermont.gov/sites/libraries/files/prb/53prb.txt. This Court has disbarred attorneys convicted of federal crimes involving the misappropriation of client funds. See, e.g., *In re Ruggiero*, 2006 VT 39, 179 Vt. 636, 898 A.2d 1251 (mem.); *In re Sinnott*, 2005 VT 109, 178 Vt. 646, 891 A.2d 896 (mem.). The sanction of a two-year suspension and probationary period that we impose on respondent is appropriate given the criminal conviction underlying his professional misconduct and the attendant circumstances.

¶ 28. Finally, respondent maintains that the Panel's failure to issue a timely decision violated his due process rights, and, as a result, the Panel's decision should be nullified and respondent's license to practice reinstated immediately. Administrative Order 9, Rule 11 sets forth the procedures for Hearing Panel decisions. It states that the Hearing Panel "shall in every case issue a decision

containing its findings of fact, conclusions of law, and the sanction imposed, if any, within 60 days after the conclusion of the hearing." A.O. 9, Rule 11(D)(5)(c). The rule does not specify a consequence for failure to comply with the deadline. Here, the Panel issued its decision on October 9, 2009, ninety-two days after the conclusion of the hearing on July 9, 2009.

¶ 29. Faced with a nearly identical situation — a Hearing Panel decision submitted about ninety days after the hearing's conclusion — we concluded in *In re McCarty* that failure to meet a rule deadline, where no consequence for failure to comply is specified, does not require this Court to imply a consequence, particularly when the delay does not lead to prejudice. 162 Vt. 535, 539, 649 A.2d 764, 766 (1994) (analogizing absence of specific consequence for Panel's failure to meet rule deadline with statutory deadline having no consequence specified by Legislature); see also *In re Boardman*, 2009 VT 42, ¶ 18, 186 Vt. 176, 979 A.2d 1010 ("[C]laim that [Judicial Conduct Board] erred in failing to rule within thirty days of the hearing, as required by . . . Rules Governing Disciplinary Control of Judges, does not identify a jurisdictional or prejudicial defect requiring reversal."). Because the rule does not designate a consequence for the delayed issuance of a decision, we are not required to imply a consequence and do not imply one here.

¶ 30. The sole prejudicial effect that respondent alleges as a result of the delayed decision is that "the delay has cost [him] time and money," presumably because he has been unable to practice while subject to the interim suspension. It is true that a delay would have subjected respondent to a longer total suspension period under the prospective one-year suspension imposed by the Panel's decision. A delay of only thirty days, however, would not prompt us to imply a consequence, particularly where respondent agreed to the interim suspension pending resolution of the disciplinary charges predicated upon his criminal convictions. Furthermore, because we have determined that respondent's two-year suspension is effective on the date that respondent's interim suspension began, the delayed decision did not extend respondent's actual period of suspension. Respondent suffered no

due process violation as a result of the Panel's decision issuing after the period contemplated by the rule.

*Respondent is suspended from the practice of law for two years effective January 9, 2009. Upon reinstatement to the bar, respondent shall be placed on probation for a minimum term of one year, during which time he shall complete no fewer than 200 hours of pro bono legal services under the auspices of the Vermont Volunteer Lawyers Project for individuals unable to afford legal counsel. This probation will accord in all other respects with the terms recommended by the Hearing Panel.*